Robert E. LEE, Appellant,

v.

STATE of Indiana, Appellee.

No. 53S00–8803–CR–367.

Supreme Court of Indiana.

Nov. 8, 1989.

Daniel Sherman, Monroe County Deputy Public Defender, Bloomington, for appellant.

Linley E. Pearson, Atty. Gen. and Gary Damon Secrest, Deputy Public Defender, Indianapolis, for appellee.

PIVARNIK, Justice.

Following a jury trial in the Monroe Superior Court II, Defendant–Appellant Robert E. Lee was convicted of Murder and sentenced to a term of sixty (60) years.

Five issues are presented for our review in this direct appeal:

1. denial of Defendant's motions to dismiss based on the intentional and negligent destruction of evidence by the State;

2. denial of motions to suppress evidence obtained from a search of Defendant's apartment;

3. admission of a three year-old writing describing a murder and mutilation substantially similar to the instant crime;

4. exclusion of defense evidence that another person may have committed the murder; and

5. sufficiency of the evidence.

On September 21, 1986, remains of Ellen Marks were discovered in a shallow grave near the house in which she lived. Acquaintances had noticed her absence and made the initial discovery when they investigated the wooded vacant lot on which her home stood. Ellen Marks' body had been precisely and laboriously mutilated: the head was missing and not recovered; her hands had been removed and also were not recovered; the torso had been laid open

and the viscera had been removed, of which the heart, liver, vagina, uterus, ovaries, anus, and rectum were never recovered; tissue from the torso and leg was missing and never recovered, and the left breast was never found. The official cause of death was multiple stab wounds and the examining pathologist concluded that a minimum of two (2) instruments were required to perform the mutilation: a cutting blade and a toothed sawing blade. The pathologist further determined that the entire process would have required hours to perform, and that the mutilation was planned, deliberate and skillful, not a frenzied butchery. A comparison of X-ray photographs provided the identification of the carcass as that of Ellen Marks. The relative size and the number of maggots feeding on the remains revealed that Ellen Marks had been killed sometime between Monday, September 15, 1986, and the evening of Wednesday, September 17, 1986. She was last seen alive by a State witness on September 16, 1986, a Tuesday, between 8:00 a.m. and 9:30 a.m.

Suspicion first centered on Robert E. Lee due to an incident in 1983. In 1983, James Burks was living on the streets and often stayed with Lee. At that time Burks entertained aspirations of becoming a confidential informant for the police. At one time in 1983, Lee asked Burks to help him carry out a plan which was written out in a spiral notebook. Lee read the plan to Burks and instructed him to copy it in order to commit it to memory; Lee then had Burks stop copying the plan because, as Lee claimed, "that's liable to get me twenty years." Burks nevertheless copied the plan. Burks informed Officer McMurry of the Bloomington Police Department about the plan, hoping to obtain fifty dollars ($50) for the information. Officer McMurry would not pay Burks; so Burks returned to Lee's apartment to retrieve the copy, but he was no longer motivated by expectations of payment. Burks gave the copy to Officer McMurry, who then sent two officers to talk with Lee. The officers were able to obtain from Lee the original writing. Lee admitted composing and fantasizing about this writing. Suspicion also centered on

Lee after Luminol testing indicated a trail of blood leading from the crime scene to Lee's boarding house. Luminol is a liquid which detects iron and, thereby, blood. However, although the Luminol testing was extensively described in various pretrial hearings, the jury was never informed of the same at trial. Due to the suspicious circumstances, officers were sent to Lee's apartment on September 23, 1986, to ask him questions. Lee consented to a search and voluntarily gave the officers a knife and sheath he usually wore. The pathologist testified that the knife (State's Exhibit No. 45A, B) could have been used in the crime as the cutting instrument, and a wood saw found at the scene could have been the sawing instrument used.

Other evidence pointed to Lee as the murderer. The week of the murder, Lee was not acting like himself. He altered his daily routine from sleeping most of the day to being awake and running in and out of his apartment. Lee was also more quiet and less tolerant of being teased. While staying with friends shortly before the murder, Lee asked his friend to sharpen the knife Lee always carried. Also, Lee was staying with the same friends when the body was discovered; Lee had his friends make a special trip and return him to his apartment, ostensibly to turn off his alarm clock. In addition, Lee purchased a small garden shovel on September 15, 1986, and was seen on a public bus around that time. He was also seen departing the bus near the crime scene.

Aside from the 1983 writing, the most incriminating items of evidence tying Lee to the murder were comparisons of trash bags from the grave site to bags found in Lee's apartment. Two (2) Hefty brand plastic trash bags were found at the grave site partially wrapping and enclosing the body (State's Exhibits Nos. 3 and 4). During a search of Lee's apartment, two similar Hefty bags were discovered and seized (State's Exhibits Nos. 1 and 2). The bags were sent for analysis to the FBI, the North Carolina Bureau of Investigation, and Mobil, Inc., the manufacturer of Hefty brand.

The FBI subjected the four bags to a visual and microscopic examination, and to gas chromatograph analysis and fourier transform infrared spectroscopy (FTIR). Their conclusion was that all four bags matched in color, texture, type, layer structure, and chemical composition. The analyst concluded that the bags all originated from the same source, or lot, of plastic, could not have come from different manufacturing plants, and were all produced within a matter of minutes or a few hours of each other.

A special agent and forensic chemist examined the bags at the North Carolina Bureau of Investigation for striation comparison. Striations are lines visible on plastic bags, and they are due either to uneven distribution of the coloring dyes used, or they are etched on the bags by a machine die during the manufacturing process. The special agent found that the striations on all four bags were consistent, which indicated that the bags were all produced at the same factory on the same production line at approximately the same time, one right after the other.

A quality control and new development official from Mobil, Inc. also examined the bags. First, the official demonstrated that analysis could determine quite accurately the approximate time, or range, of production for plastic bags. The tests run by Mobil on the four bags included a visual examination, an FTIR, a differential scanning calorimetry (DSC), and a gauge profile. The gauge profile revealed that the bags were each approximately 1.5 mm thick, which showed that they were not of recent manufacture because in April of 1984, the production thickness was reduced from 1.5 mm to 1.4 mm (the current thickness is 1.3 mm). The FTIR revealed that the bags were identical in sixteen (16) aspects, and the DSC showed that the construction materials of the bags were identical. Mobil's ultimate conclusion was that all four bags were made on the same production line within six (6) hours of each other, with four (4) hours being the most likely time span.

I

Lee filed a motion to dismiss in the trial court based on the intentional destruction by the police of tapes containing interrogation of Lee and the loss or negligent destruction of a tape recording of a 911 emergency call by Richard Wilson.

There is no dispute that the police interrogated Lee at various times over a period of three days. Lee claims the period of interrogation may have covered as many as twenty hours but the State maintains the actual time in interrogation was about six hours. Further, the parties agree that Lee made no admissions during the taped interrogations or at any other time. He claimed he was innocent and had nothing to do with the crime. The interrogations were contained in four tape cassettes. Three of the tapes were erased by police and one remained intact. The remaining tape was never offered into evidence and the fact that interrogation and taping was done was never mentioned to the jury. In the hearing on the motion to dismiss, police officers testified that Lee did not respond to them during the interrogation, that he hung his head and mumbled to the extent that his responses were inaudible on the tape and that those responses which were audible were denials that he had anything to do with this crime. They testified they felt there was nothing of any value or use on the tapes. They further testified, however, that that was not the primary reason for destroying the tapes. The officers admitted that the police used questionable tactics during the interrogation that they felt would cause embarrassment to the department if the tapes were published. In attempting to get responses from Lee during the interrogation, the police admitted they used very foul language and asked questions that were below the standards of a reputable police force. Examples of these questions were inquiries or accusations that Lee had had sexual intercourse with his mother and references to Jesus Christ. In reviewing the tapes, the police felt it was poor judgment to question Lee in this manner and felt they would be embarrassed by publication; so they erased

the tapes. They maintain, however, that there was nothing on the tapes of any value for the reasons stated above and were willing to maintain before the trial court that they did not intend to use the tapes in any manner because there was nothing incriminating in them, and they agreed that at no time did Lee ever admit any involvement in this crime.

Lee does not point to any particular item in the conduct of police that causes prejudice to him in that it destroyed exculpatory matters useful to his defense. His objection is more general, consistent with his defense that the police were bent on procuring his conviction for this crime, ignoring evidence that pointed to others who might have perpetrated it. Lee argues this whole incident demonstrates they were willing to ignore or destroy any evidence that might be helpful to Lee. The trial court denied the dismissal motion, stating:

> In light of these destruction-of-evidence cases, it appears to the Court that defendant has failed to show that the evidence lost and destroyed by the Bloomington Police Department was material. In the case of the tapes of the defendant's interrogation, any exculpatory statements that might have been made by the defendant to the police are presumably yet within the knowledge of the defendant. No evidence to the contrary has been presented to this Court. Similarly, the decision by the police to erase the tapes binds the State to its determination of the lack of materiality of any statements made by the defendant during the course of this investigation, either as to the voluntariness of such statements or bearing upon the merits of this case.

*Record* at 424.

The actions of the police here present a serious problem. We agree with their own appraisal that their method of interrogation was beneath the dignity of a police force and showed a lack of good judgment. They compounded poor judgment by destroying the tapes.

■ It is well established that the negligent destruction or withholding of material evidence by police or prosecution may present grounds for reversal. The defendant must establish materiality as a condition precedent to claiming a denial of due process where evidence is negligently lost or withheld by the government except where the materiality is self evident or a showing of materiality is presented by the destruction of the evidence. *Seay v. State* (1988), Ind., 529 N.E.2d 106, 108; *Myers v. State* (1987), Ind., 510 N.E.2d 1360, 1364; *Turpin v. State* (1980), 272 Ind. 629, 631–32, 400 N.E.2d 1119, 1121; *Birkla v. State* (1975), 263 Ind. 37, 42–49, 323 N.E.2d 645, 648–54, *cert. denied* (1975), 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77; *Hale v. State* (1967), 248 Ind. 630, 634–36, 230 N.E.2d 432, 435.

■ In *Birkla*, Robert L. Smithhart was jointly charged with Defendant–Appellant Birkla with killing David L. Higgins during the perpetration of a robbery. During Smithhart's incarceration in the county jail, his wife, Charlene, came to the Evansville Police Department to visit him and Smithhart was brought from the county jail and allowed to visit his wife in a private interrogation room. Unknown to the Smithharts, their actions were recorded by a video camera through a two-way mirror. Their voices also were being recorded by a speaker type microphone placed on the table before them. When the prosecutor became aware of the videotape, he determined that because the tape had been made without the consent of the Smithharts and without the knowledge of their attorney who also represented the appellant, the tape would be inadmissible by the State. The prosecutor also recognized his duty to view the videotape for evidence exculpatory of either of the accused. After viewing the videotape, he ordered it erased. After learning of the tape, Birkla's attorney moved for discovery and the motion was granted. When the prosecutor responded that the tape had been erased, Appellant moved to dismiss and his motion was overruled by the trial court. *Birkla* expanded on principles expressed in *Hale*, finding that a prosecutor's suppression of evidence favorable to an accused upon request violates due process when the evidence is ma-

terial either to guilt or punishment, irrespective of the *bona fides* of the prosecution. 263 Ind. at 42, 323 N.E.2d at 648 (citing *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215). This Court found the prosecutor was not required to disclose or produce non-material evidence and has the authority to determine whether particular non-material evidence should be produced, retained, or destroyed. If the prosecutor decides to retain evidence of a questionable materiality, it is clear that his subsequent conduct at trial in exaggerating its non-production may enhance the materiality and require its production. *Id.* at 43, 323 N.E.2d at 648. *See also Arline v. State* (1973), 156 Ind. App. 95, 104, 294 N.E.2d 840, 846.

It follows, of course, the same would be true of evidence destroyed by the prosecution, and a more serious question would be presented if the State attempted to present incriminating evidence against the defendant based on an item that had been destroyed by the State. In *Birkla*, this Court found the defendant failed to show the materiality that resulted in prejudice to him because there appeared to be nothing on the videotape that would be exculpatory of the defendant and the recording did not furnish any evidence admissible by either party in the trial of the cause.

In the instant case, the police testified the tapes contained nothing except inaudible responses and denials from Lee. They admitted their conduct reflected on the tapes demonstrated a lack of good judgment that would be embarrassing to them but further admitted nothing incriminatory resulted. Lee does not disagree with this. He makes no claim anything else appeared on the tapes that he could use in his defense other than the fact that the police were suspect in destroying them. No effort was made by the State to present this to the jury and they had no knowledge of the incident. Therefore, we fail to see the trial court abused its discretion in denying the motion to dismiss for the reasons given. We find no reversible error on this issue.

■ The second items of evidence missing was a taped 911 emergency call by Richard Wilson in October, 1986. Wilson reached dispatcher Donna Anderson. She testified the caller did not identify himself but said he knew Lee and James Burks and that he, the caller, had committed the crime. Anderson placed a trace on the call and determined it came from a restaurant. An officer was dispatched to the scene and found Richard Wilson on a pay telephone. Anderson claims she recorded the call and placed the tape in the hands of a detective, but the cassette was never found after that. The trial court refused to dismiss on grounds of this missing item of evidence based on the fact that Wilson, Anderson, and the officer dispatched to the restaurant all testified at trial for the defense. The defense was permitted to offer evidence calculated to show Wilson was a likely suspect for committing this crime. Anderson testified that while on the telephone Wilson told her about the written statement drawn by Lee, and known by Burks, outlining a plan for murdering a woman. She stated the man sounded like he was very intoxicated, spoke with a slurring type of speech and was rather rambling in his discussion. Wilson testified at trial he met James Burks only once, remembered calling 911, but did not remember much about what he said because he had since been in an automobile accident that hampered his memory. He admitted being intoxicated when he made the call and was unable to identify a photograph of the victim. He denied killing Marks. Rich Hunter testified he was the officer dispatched to the restaurant and when he found Wilson, Wilson appeared extremely intoxicated, could barely stand on his own and had to be helped into the squad car. Wilson was insistent on telling Hunter about the writing composed about three years earlier and that he knew about it from Lee and James Burks. Wilson denied involvement in the murder to Hunter, and Hunter released him after giving him some coffee to drink.

The trial court found the loss of the tape worked no incurable prejudice on the defense since the subject of it was reconstructed by all of the parties concerned and it was of minimal probative value. The defense was able to offer evidence attempt-

ing to show Wilson was a likely suspect in the commission of this murder, including the incident of the phone call. We agree with the appraisal of the trial court on this issue and find no abuse of discretion meriting reversal.

## II

Lee filed a motion to suppress items taken from his apartment in the execution of a search warrant. The only items from the search offered and admitted into evidence were two Hefty brand trash bags admitted as State's Exhibits 1 and 2. Lee claims insufficient probable cause was shown to the magistrate who issued the search warrant and the trash bags were not proper items to seize because they were not among the enumerated items targeted by the search warrant.

■ In the affidavit supporting the request for a search warrant, two bases were alleged: 1) the written plan composed by Lee and 2) Luminol testing which indicated a possible blood trail from the crime scene to the rear door of Lee's boarding house. Lee claims the writing is an improper basis because of its age and the fact that he denied any intention of carrying out its instructions. He claims the Luminol testing was an improper consideration because the spraying was conducted on the property of the boarding house and onto the rear portion of the building. This constituted a warrantless search by itself and was ineligible to support the issuance of a warrant. Lee relies on this Court's holdings in *Raymer v. State* (1985), Ind., 482 N.E.2d 253 and *Ashley v. State* (1968), 251 Ind. 359, 241 N.E.2d 264, for the proposition that stale information cannot support a finding of probable cause because stale information only gives rise to a mere suspicion and not a reasonable belief, especially when the items to be obtained in a search are easily concealed and moved. Both *Raymer* and *Ashley* dealt with the question of illegal drugs which are likely to be moved about over a period of time. Probable cause of their presence at a given place on a given day cannot be based on the fact they were present at that place some time in the past.

The writing in this case is not of such character. The police had before them and presented to the magistrate the fact that a woman had been murdered and mutilated in a similar fashion to that described in Lee's writing. Lee's residence was very close to that of the victim and to the place of her burial. The fact that the writing had been made three years before the commission of the crime rather than more recently did not reduce its efficacy to supply probable cause justifying the issuance of a search warrant.

The buildings at 506 and 508 North Adams are boarding houses owned by Myer Waxler and managed by Ireland Scott. Lee lived in one of the apartments or rooms. He had no ownership or control of the rest of the building and therefore had no legitimate privacy interest in it. In *Rakas v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, the United States Supreme Court established the test to be followed in reaching a determination of whether a non-owner may challenge the constitutional validity of a search. The test is the "legitimate expectation of privacy" in the place searched. *Id.* at 148–49, 99 S.Ct. at 433, 58 L.Ed.2d at 404–05. Whether an expectation of privacy exists is a fact question to be determined on a case by case basis. Lee had no legitimate expectation of privacy in the entire building because he had no control over it and no ownership in it. *Stout v. State* (1985), Ind., 479 N.E.2d 563, 567; *Tobias v. State* (1985), Ind., 479 N.E.2d 508, 510.

■ Since the officers were on the premises executing a proper search warrant, it was permissible for them to seize items in their plain view that were or had the appearance of being contraband or involved in the crime under investigation, and such items would be admissible into evidence. *Clark v. State* (1986), Ind., 498 N.E.2d 918, 921. The search warrant directed the police to use a Luminol test to find items containing blood. While doing so, the police observed Hefty brand bags in plain view. Officer Cobb was aware that Hefty brand plastic bags similar in appearance were found wrapped around and containing the

victim's body. He was further aware of their evidentiary value because tests could be made on them to match and compare them with each other. Officer Luck testified that he did not know of the evidentiary value of the Hefty bags but Cobb told him of their significance while he and Cobb were in the apartment. A similar situation was presented in *White v. State* (1987), Ind., 517 N.E.2d 83, where an officer followed tennis shoe prints in the snow to White's home. White's brother allowed the officer inside where he spotted a pair of wet tennis shoes and seized them. This Court held the seizure was permitted under the plain view exception to the warrant requirement. This Court held "[t]hese facts would lead a reasonable man to believe that the shoes might be evidence of a crime." *Id.* at 86. The same can be said of the Hefty trash bags in the instant case. No error is presented on this issue.

### III

■ Lee claims the trial court improperly admitted his 1983 writing, which outlined a method of raping, murdering and mutilating a woman or girl substantially similar to the manner in which the victim was treated in the instant case. Lee had written this plan in 1983 detailing how it was to be carried out, particularly designating the parts of the body that would be excised and how these parts would be disposed of. In 1983, Lee discussed this plan with James Burk, causing Burk to make a copy of it and soliciting Burk to help him carry it out. Ellen Marks' body was mutilated in the manner described in the writing, with parts removed as the writing indicated they would be removed. Medical experts testified the mutilation of the body was not a haphazard butchering but was a precise, planned, and skillfully performed operation which probably took several hours to complete. Lee claims the exhibit is inadmissible because it does not meet any of the exceptions to the general rule against evidence of prior criminal or bad acts. Although this may be true, it does not render the exhibit inadmissible. The question is whether the writing was material and relevant. It was certainly relevant on the issue of Lee's identity and motive. *Gibbs v. State* (1985), Ind., 483 N.E.2d 1365, 1368. Any evidence tending to prove a material fact is admissible even though its tendency in that direction may be slight. *Callahan v. State* (1988), Ind., 527 N.E.2d 1133, 1137. A trial court has broad discretion when ruling on the relevance and materiality of evidence. *Callahan, supra; Shumaker v. State* (1988), Ind., 523 N.E.2d 1381, 1384.

In *Norton v. State* (1980), 273 Ind. 635, 408 N.E.2d 514, the trial court permitted exhibits and testimony concerning an alleged robbery plan to be placed in evidence. A witness testified Norton and others had obtained certain articles in anticipation of robbing a poker game. Although that robbery was never carried out, several of the items were, in fact, used in the commission of the murders for which Norton was on trial. This Court found that the exhibits and testimony showed the origin of some of the items used in the charged crimes and put the obtaining of these items into the context of a plan involving Norton and an accomplice, Benjamin Woody, by showing Norton's knowledge of the existence of the items used. This evidence drew a direct connection between Woody, Norton, and the crimes with which Norton was charged and, therefore, was properly admitted. *Id.* at 648–49, 408 N.E.2d at 524–25. In *Hart v. State* (1978), 268 Ind. 358, 375 N.E.2d 221, a witness was permitted to testify that two or three years prior to the robbery the appellant had told him he was going to rob the Kary Out Liquor Store and that it looked rather easy. This Court found that evidence tending to prove a material fact, even though its tendency in that direction is slight, is admissible, and all circumstances relative to or tending to shed light on the intent or motive of the defendant, or tending fairly to explain his actions, are admissible even though they occurred prior to the crime. *Id.* at 359, 375 N.E.2d at 222. The trial court did not err in admitting Lee's written plan into evidence.

### IV

■ Lee claims the trial court erroneously excluded evidence that Raymond Benja-

min might have committed the crime. The trial court refused to permit the evidence and Lee offered to prove, through witnesses Mark and Nancy Haggarty, that Benjamin had been staying with them around the time of this murder and was evicted by Haggarty on September 15, 1986. Haggarty stated he was missing several knives and two or three shovels about the time of the crime and thought Benjamin acted in a suspicious manner. Benjamin had asked to borrow a pair of Haggarty's trousers because his were soiled. He was also aware that Benjamin had at one time asked Ellen Marks to go to a wiener roast with him and she refused. In *Burdine v. State* (1987), Ind., 515 N.E.2d 1085, this Court held, "[t]o be admissible, such evidence must do more than cast suspicion or raise a conjectural inference that a third person committed the crime; it must directly connect the third party to the crime charged." *Id.* at 1094. The defense here was permitted to present to the jury facts tending to indicate Richard Wilson or James Burks might have been the perpetrator. The court refused to permit the testimony regarding Benjamin, finding it did no more than cast suspicion or conjecture. The trial court did not err in excluding this evidence.

## V

 Finally, Lee claims the circumstantial evidence was not sufficient to identify him as the perpetrator of the murder. He does not deny a conviction may be sustained solely by circumstantial evidence. *Haymaker v. State* (1988), Ind., 528 N.E.2d 83, 85; *Decker v. State* (1988), Ind., 528 N.E.2d 1119, 1122. The facts presented to the jury here supported their verdict of murder beyond a reasonable doubt.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.