Raleigh TAYLOR, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–9311–CR–1264.

Supreme Court of Indiana.

Dec. 28, 1995.

Ali A. Talib, Indianapolis, for appellant.

Pamela Carter, Attorney General, Dana Childress–Jones, Deputy Attorney General, Indianapolis, for appellee.

## ON DIRECT APPEAL

SHEPARD, Chief Justice.

Appellant Raleigh Taylor was tried before a jury and found guilty but mentally ill of murder, Ind.Code Ann. § 35–42–1–1 (West Supp.1990), and guilty but mentally ill of burglary resulting in serious bodily injury, a class A felony, Ind.Code Ann. § 35–43–2–1 (West 1986). The court sentenced Taylor to consecutive terms of sixty years for murder and fifty years for burglary. We affirm.

The evidence favorable to the verdict shows that the murder victim, Tawana Smith, was the daughter of Taylor's long-time girl-friend Cathy Smith. Taylor lived with Cathy and her three daughters, Tawana, Rhonda, and Zakiya, during the late 1980s and into early 1990. In March 1990, Tawana filed charges accusing Taylor of molesting her several years earlier, prompting Taylor to move out of the house and into the YMCA. Tawana and her eight-month-old son also left the household. They moved in with her aunt, Phyllis Smith, and Phyllis's daughter, Renica Johnson.

Close to midnight on the evening of May 4, 1990, Tawana and Renica decided to go for a drive with one of Renica's friends, Nicole Durham. As they were leaving the parking lot, Tawana spotted Taylor in her mother's blue Datsun. Tawana knew that Taylor was angry at her for claiming he molested her, so she ducked down in the back seat and instructed Nicole to drive on. The three soon decided to return to warn Phyllis Smith of Taylor's presence. When they arrived back at the apartment, Taylor was nowhere to be seen. As Nicole parked the car, however, he emerged from behind a parked van, pulled a gun, and jerked Tawana from the back seat. He then shot Tawana six times in the head and chest at close range.

Renica and Nicole ran to the apartment to call the police and locked the door behind them. Taylor followed. He broke into the apartment and attacked Phyllis Smith, hitting her repeatedly with the butt of the gun. He then fled the area, and the police later picked him up in Florida.

Taylor raises three issues on appeal. First, he contends that four of the State's exhibits should have been excluded as the product of illegal seizures. Second, he argues that the court should not have permitted the State's psychiatrist to recount Tay-

lor's descriptions of the night of the murder. Third, he contends the court improperly admitted evidence about the victim's charge that Taylor molested her.

### I. Seizures from the Car

First, appellant challenges the seizure of certain items during a search of the car he drove the night of the shooting. Specifically, he objects to the admission of a blood-stained sheet of paper, a two-page letter written by Taylor to the murdered girl's mother, Cathy Smith,[1] and photographs of the interior of the car and the letter. He claims the seizures were beyond the scope of the warrant that authorized searching the vehicle.

■ The Fourth Amendment protects both privacy and possessory interests by prohibiting unreasonable searches and seizures. Since a warrant is generally required, *Wright v. State*, Ind., 593 N.E.2d 1192, *cert. denied*, 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 540 (1992), when a defendant challenges a warrantless search or seizure, the burden lies with the State to justify on Constitutional grounds the failure to secure a warrant, *White v. State* (1987), Ind., 517 N.E.2d 83. On review, we will not reweigh the evidence. We consider only the evidence most favor-

---

1. In the handwritten letter, Taylor describes his anger with Tawana and Phyllis Smith for charging him with child molesting, and he threatens to kill them both. The following is the complete text of that letter, with proper spellings of names and minimal editorial corrections:

    Dear Cat[,]
    You are a real good person[.] But I can't let this go on any longer, [Tawana] and [Phyllis] have been lying on me so bad its a shame and I'm not going to jail for nothing. Who in the hell do they think I am[?] I wouldn't molest a piece of "Gold[.]" Not to speak of some little black ass kid, I like women not Babies.
    I would rather be dead than locked up for something I didn't do. I was born a free man[.] I will die a free man. This is going to hurt you but I'm sorry, God! I'm sorry but the way [Tawana] have treated you is wrong[.] No one should be lie to lie on and abuse that way. I have never ever seen anyone such as these people before but, today we are all going to ~~did~~ die[.] I'm going to send these witches to hell and I'm going too. Just to make sure that they never raise again. [G]oing to miss you[,] Zak and Rhon. [P]lease look after her real good

    because she needs it please. [T]ell her I love her and will love her for ever and always love you Zak. And you need to take baby Raheem and raise him because you have a kind heart[.] No one else is going to treat him fairly[.] Plus I don't trust your Mother[.] [S]he is a dirty nasty bitch[.] Not clean at all[.]
    [Y]ou will find out that your Mother and sister is the cause of this whole thing[.] I learned by someone else that they told [Tawana] lie and say that I molested her[.]
    [R]aise the baby and the Kids well[.] God will bless you. I hadn't been in that house in so long it looks strange[.] [Too] bad no one was at home.
    [R]emember pay your bills and feed the Kids good meals. [D]on't worry you have [two] girls who will do anything for you and [Raheem] will be the same.
    Good By
    Good By
    God Bless
    KEEp ThosE Kids aWAy froM your Mother aNd BrothEr BECAUSE ThEy arE goiNg To jail SooN.
    R. at 1628 (State's Ex. 31) (uncorrected errors in original).

able to the trial court's ruling and any uncontradicted adverse evidence. *Id.*

As part of their investigation, the police secured a search warrant for Taylor's apartment at the YMCA and for the 1979 blue Datsun he drove the night of the shooting.[2] The warrant for the car specified a search for "a large caliber handgun and ammunition." Officer Jim Meyer conducted the search; he testified that upon opening the car door, he saw a sheet of yellow lined paper next to the driver's seat. The paper appeared to have "blood or another body substance" on it so he retained it as evidence. Continuing his search, he opened a console between the seats where he found two folded sheets of yellow lined paper, which turned out to be a letter from Taylor to Cathy Smith. He removed the papers to search the compartment for the revolver and bullets. Finding neither, he then compared the blood-stained paper with the pages from the console. The officer testified he initially seized the letter because he believed it could provide a link, via fingerprints or handwriting, between the perpetrator and the blood-stained sheet. Photographs were also taken of the car's interior and the two sheets of paper.

■ The State contends that the seizure of the paper and letter were justified under the plain view doctrine. According to that doctrine, an officer may seize incriminating evidence without a warrant when two conditions are met. First, the officer must have otherwise complied with the Fourth Amendment. This means that "not only must the officer be lawfully located in a place from which the

object can be plainly seen, but he or she must also have a lawful right of access to the object itself." *Horton v. California,* 496 U.S. 128, 137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). As the Supreme Court explained in *Coolidge v. New Hampshire,* "plain view *alone* is never enough to justify the warrantless seizure of evidence." 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971) (emphasis in original). The initial intrusion must have been authorized under the Fourth Amendment. *Horton,* 496 U.S. at 136–37, 110 S.Ct. at 2307–08; *Coolidge,* 403 U.S. at 465–66, 467–68, 91 S.Ct. at 2037–38, 2038–39.[3] Second, the incriminating nature of the evidence must have been immediately apparent. *Horton,* 496 U.S. at 136, 110 S.Ct. at 2307.[4]

Appellant neither contests the validity of the warrant nor denies that Officer Meyer was proceeding within the scope of the warrant when he opened the car door and found the blood-stained paper or when he opened the center compartment and found the letter. The paper and letter were not, however, within the scope of the warrant, and the question presented is whether the incriminating nature of these items was immediately apparent to the officer. If not, even though they were in plain view they could not be seized without a separate warrant.

■ The "immediately apparent" prong of the plain view doctrine requires that law enforcement officials have probable cause to believe the evidence will prove useful in solving a crime. *See, e.g., White,* 517 N.E.2d at 85; *see also Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347

2. The vehicle in question actually belonged to Cathy Smith, but the State effectively waives any claim concerning Taylor's standing to challenge the seizure. Brief for Appellee, at 5 n. 4.

3. As the Court explained in *Coolidge* and reiterated in *Horton,* simply viewing incriminating evidence or even contraband does not necessarily justify its warrantless seizure. *Horton,* 496 U.S. at 137 n. 7, 110 S.Ct. at 2308 n. 7 (quoting *Coolidge,* 403 U.S. at 468, 91 S.Ct. at 2039). Suppose, for example, an officer happens to see evidence of a crime through the open window of a suspect's house. The plain view doctrine would not excuse the officer from obtaining a warrant before entering the dwelling. *See Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *McDonald v. United*

*States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *cf. Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (finding no exigent circumstances, warrantless entry of house to arrest house guest was not justified).

4. According to the *Coolidge* Court, officers were justified in seizing property where (1) the officer was lawfully in a place or position where he could see the property seized; (2) the officer discovered the item inadvertently during the course of a valid search; and (3) it was immediately apparent to the officer that the item was contraband or evidence of criminal activity. 403 U.S. at 466–67, 91 S.Ct. at 2038. In *Horton,* the Supreme Court abandoned the inadvertence requirement.

(1987). As a plurality of the Supreme Court explained in *Texas v. Brown*, this does not mean that the officer must "know" that the item is evidence of criminal behavior. 460 U.S. 730, 741, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983). Probable cause requires only that the information available to the officer would lead a person of reasonable caution to believe the items could be useful as evidence of a crime. *Id.* at 742, 103 S.Ct. at 1543. "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.*

■ Appellant contends that Meyer could not have believed that the letter was evidence related to the murder until after he unfolded and read it. The State counters that the blood on the first sheet of paper was sufficient to justify its seizure and that Meyer had probable cause to seize the letter given its similarity to the blood-stained sheet.

The trial court was correct to admit the exhibits. First, Meyer knew he was investigating a murder committed with a firearm, a shooting that would, of course, produce a good deal of blood. The apparent blood stains on the sheet of paper in the door certainly justified its seizure. *Cf. Hopkins v. State* (1991), Ind., 582 N.E.2d 345 (upholding plain view seizure of blood-stained towel during warranted search of vehicle). Second, when Meyer stumbled across the letter, written on similar yellow lined paper, he naturally connected the two items. A person of reasonable caution certainly could have concluded that the pages from the console were related to the page found in the door, and that together they would aid in the murder investigation. *Cf. Lee v. State* (1989), Ind., 545 N.E.2d 1085 (upholding plain view seizure of trash bags during warranted search of apartment).

Meyer's subsequent discovery that the contents of the letter were relevant to the murder was also reasonable. After Meyer seized the papers, it was reasonable to inspect them for blood stains and fingerprints and to compare them with the previously seized paper. As the Supreme Court explained in *Arizona v. Hicks*, "It would be absurd to say that an object could lawfully be seized and taken from the premises, but could not be moved for closer examination." 480 U.S. at 326, 107 S.Ct. at 1153. It did not take much effort to determine the relevancy of the letter. It begins with a reference to the murdered girl and her aunt and ends with "Good-by, Good-by, God Bless," set off from the rest of the text in large letters.

Finally, because the search of the car was justified under the warrant, and the seizures of the papers were reasonable, the photographs were also admissible at trial. *See Tata v. State* (1986), Ind., 486 N.E.2d 1025.

## II. Examination by the State's Psychiatrist

Appellant claims his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to the assistance of counsel were violated. Relying on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), Taylor argues that the State's psychiatrist was required to identify himself as an agent of the State and to inform Taylor of his *Miranda* rights before his examination. We disagree.

The defense raised the issue of the Taylor's mental stability early in the proceedings. In February 1991, the defense requested that the court appoint two disinterested physicians to determine if Taylor was competent to stand trial and to evaluate his sanity at the time of the shooting. The court appointed Dr. Ned P. Masbaum and Dr. Roger W. Perry to conduct the examinations. The doctors agreed that Taylor could understand the proceedings and assist in his defense and that he probably understood right from wrong on the night of the shooting.

Two months later the defense formally filed notice of its intention to plead insanity.[5]

---

5. Indiana Code § 35–36–2–1 requires a defendant to file a notice of intent to raise the insanity defense. Ind.Code Ann. § 35–36–2–1 (West 1986). Indiana Code § 35–36–2–2 provides that "[w]hen notice of an insanity defense is filed, the court shall appoint two (2) or three (3) competent disinterested psychiatrists, psychologists ... or physicians ... to examine the defendant and to testify at the trial." Ind.Code Ann. § 35–36–2–2 (West Supp.1994). In this case, the court

At trial, the defense called four mental health experts to the stand: Gary and Pamela Porter, specialists in post-traumatic stress; Dr. Elgan Baker, a clinical psychologist and psychoanalyst; and Dr. John P. Wilson, a psychologist. Each testified that Taylor suffered from post-traumatic stress disorder after his combat experiences in Vietnam and that he did not know right from wrong at the time of the shooting. The State also had Taylor examined by a psychiatrist, Dr. David Crane, who testified that Taylor's descriptions of the night of the shooting revealed that he did know right from wrong.

### A. Miranda Warnings and the State's Physician

■ Taylor contends that the privilege against self-incrimination extends to psychiatric examinations. This Court so held long ago. *Haskett v. State* (1970), 255 Ind. 206, 263 N.E.2d 529. Some years later, the U.S. Supreme Court held a defendant must receive *Miranda* warnings before participating in a court-ordered psychiatric exam if his statements are to be used to prove his future dangerousness in the penalty phase of a capital trial. *Estelle*, 451 U.S. at 468, 101 S.Ct. at 1875.

It is also well-established, however, that a defendant is not entitled to *Miranda* warnings when he raises the issue of his own sanity at the time of the offense. In *Estelle*, the Court limited its holding to cases in which the defendant "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence." *Estelle*, 451 U.S. at 468, 101 S.Ct. at 1876. Later in *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Court had occasion to apply this rule. In *Buchanan*, the defense joined the State in requesting a psychiatric examination of the defendant to determine if he should receive treatment pending trial. When the defendant raised the defense of extreme emotional distress at trial, the State responded by offering the physician's evaluation in rebuttal. The Court held that once "a defendant requests such an evaluation or presents psychiatric evidence, then,

at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Id.* at 422–23, 107 S.Ct. at 2917–18.

Such was our reasoning in *Dickson v. State* (1989), Ind., 533 N.E.2d 586, where a defendant pled insanity and then challenged his conviction when the court-appointed psychiatrists did not support his defense. We explained that "[t]he necessity of advising appellant concerning his right to remain silent did not arise since the examinations were initiated and approved by him." *Id.* at 588; *see also Mahaffey v. State* (1984), Ind., 459 N.E.2d 380, 382 ("[The defendant] initiated the psychiatric examination when he filed his special plea of insanity, and accepted the fact that he would be then subject to psychiatric examination and evaluation for the purpose of generating evidence admissible in the oncoming trial and useful to the prosecution in defeating his position.").

Taylor was not entitled to *Miranda* warnings prior to his interview with Dr. Crane. Taylor had ample opportunity to consult with counsel regarding his defense, and together they chose to plead insanity with full knowledge that Taylor might have to submit to psychiatric testing by the State.

■ Furthermore, Dr. Crane did not err by failing to identify himself as an agent of the State. Crane did not misrepresent himself as a defense expert, and he expressly told Taylor the interview would not remain confidential. Supp. R. at 649. Moreover, Taylor's objection suggests only that had he known with whom he was meeting, he would have tailored his responses to his audience. This, of course, would defeat the purpose of the exam.

### B. Scope and Use of the Psychiatric Examination

■ Taylor also argues his Sixth Amendment right to counsel was violated. He does not claim he was denied the chance to consult with counsel. Rather, he complains the defense was not notified that Dr. Crane's exam-

---

relied on the earlier reports by Perry and Masbaum and their testimony at trial rather than

ordering new examinations or appointing new physicians.

ination would touch on the events surrounding the crime itself and that the doctor would testify concerning Taylor's statements about the shooting. This claim fails.

A defendant is entitled to the opportunity to consult with counsel before submitting to a psychiatric examination by the State. In *Estelle*, the Supreme Court emphasized that a defendant must be given the benefit of "the assistance of his attorneys in making the significant decision of whether to submit to the examination." 451 U.S. at 471, 101 S.Ct. at 1877. The *Estelle* Court also recognized the importance of notifying the defense "to what end the psychiatrist's findings could be employed." *Id.* Later, in *Buchanan*, the Court reiterated that in order for counsel to perform effectively, counsel must be "informed about the scope and nature of the proceeding." 483 U.S. at 424, 107 S.Ct. at 2919.

When the defense of insanity is raised, of course, counsel is on notice that the State may examine the defendant and that the results of that examination may be used to rebut the insanity claim. So long as the testimony of the State's physician goes to the mental capacity of the defendant, the requirements of the Sixth Amendment have been satisfied. *Id.* at 424–25, 107 S.Ct. at 2918–19. The State may not, however, use a defendant's statements during such an examination to demonstrate his guilt. *See, e.g., United States v. Albright,* 388 F.2d 719, 725 (4th Cir.1968). As we have explained, the purpose of the exam is to evaluate the defendant's mental health, not to gather further evidence of guilt. The focus of the examination must be the defendant's mental health, and the physician's trial testimony must remain similarly focused. *See Stolarz v. State* (1983), Ind.App., 445 N.E.2d 114 (upholding conviction where State's psychiatrists not permitted to testify about what defendant told them regarding crime itself).

The justification for permitting the State's examination is the "maintenance of a 'fair state-individual balance,'" *Albright,* 388 F.2d at 724. The defendant may not plead insanity and then prevent the State from gathering reliable evidence bearing on that issue. As the Court explained in *Estelle,* "[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case." *Estelle,* 451 U.S. at 465, 101 S.Ct. at 1874. On the other hand, the State may not misuse its access to the defendant by attempting to prove the defendant's guilt through the testimony of its physician.[6] If the court finds that the State is abusing the opportunity and using the defendant's statements to demonstrate guilt, it should not hesitate to exclude such statements.

There will be cases, however, in which the defendant makes statements during the interview that are both probative of his sanity at the time of the crime and incriminating. *See Phelan v. State* (1980), 273 Ind. 542, 406 N.E.2d 237; *see also Gibson v. Zahradnick,* 581 F.2d 75 (4th Cir.) *cert. denied,* 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978). In such cases, if the prejudice to the defendant does not substantially outweigh its probative value, the statements may be admitted. This determination we leave to the sound discretion of the trial judge.

In this case, the doctor's testimony did not prejudice the defendant. To the extent that Crane's testimony bore on the issue of guilt, it was cumulative of evidence already before the jury. Renica Johnson and Nicole Durham had already testified as eyewitnesses to the shooting, and both identified Taylor as the perpetrator. The State had shown further that the bullets removed from Tawana's body could have been the same type as those found in Taylor's apartment after the shooting. Ms. Smith had also testified, consistent with the testimony of Renica and Nicole, that Taylor broke into her apartment and beat her with a revolver.

---

6. The Fourth Circuit in *Albright* based its holding that the state could compel a defendant to sit for a psychiatric examination on the fact that "the purpose of the examination is not to determine whether a defendant did nor did not do the criminal acts charged, but whether he possessed the requisite mental capacity to be criminally responsible therefor, if other proof establishes that he did do them." *Albright,* 388 F.2d at 725.

Furthermore, Crane's testimony was highly probative of Taylor's mental state at the time of the shooting. The defense theory was that Taylor suffered from post-traumatic stress as a result of service in Vietnam and that he was in a dissociative state when he shot Tawana. Consistent with this strategy, defense experts testified that Taylor believed he was in Vietnam on May 5 and that he had no memory of the murder.[7] In response, Crane testified he was suspicious of Taylor's alleged psychological impairment. Crane pointed to the fact that while Taylor did not admit shooting Tawana, he did recall many of the details of the incident, including that he had a gun and that he fired it.[8]

Taylor's right to assistance of counsel was not violated by Dr. Crane's testimony. When the defense put Taylor's sanity in issue, it was fully aware that the State could have its own expert examine the defendant and testify at trial. The defense was also aware that the events of May 5 would play a role in assessing Taylor's mental state at that time.[9] Crane's testimony was highly probative of Taylor's sanity at the time of the crime. There is no indication that the doctor's testimony was offered for any reason other than to explain his assessment of Taylor's mental health. As the Supreme Court reasoned in *Buchanan*, the defendant had ample opportunity for consultation with counsel before raising the insanity defense, and counsel should have anticipated that the State would use such an examination to rebut the defense. *Buchanan*, 483 U.S. at 424–25, 107 S.Ct. at 2918–19.

### III. The Child Molestation Charges

Finally, Taylor argues that the trial court should have excluded evidence relating to Tawana's charges that he molested her. First, he claims that the information was inadmissible because it was introduced to show his bad character and was unfairly prejudicial. Second, he argues that part of the testimony given by the officer in charge of Tawana's complaint was hearsay.

At trial, the State introduced a four-count information, filed March 5, 1990, charging that in 1985 Taylor unlawfully fondled, touched, and had sexual intercourse with Tawana. The information also alleged that in 1987, he unlawfully fondled, touched, and had unlawful sexual conduct with her. In addition, Monica Endres, the officer who handled the case, testified about the circumstances surrounding the charges and recounted Tawana's explanation for the delay in coming forward. The exchange between the prosecutor and Officer Endres follows:

Q: And when you talked with Tawana Smith, was she able to indicate to you why it took so long for her to come forward with some of the allegations contained in that information?

A: Yes.... She said she was scared to tell, thinking no one would believe her,

---

7. For example, Pamela Porter testified for the defense that "[a]s [Taylor] talks about approaching the house, Phyllis Smith's house, he said that he had a sense that he was walking into an ambush, that he could in fact see trees and that her apartment looked like a hooch. So for Raleigh, he was in Vietnam." R. at 1863. She also said that the defendant did not remember the shooting itself. R. at 1876.

Similarly, Dr. John P. Wilson testified that "[in] Mr. Taylor's account to me, his report to me that he was coming through the bushes and saw a hooch, is very interesting because it's a perceptual distortion. In fact, there aren't woods and bushes and trees around the unit and the unit itself is not a freestanding unit." Supp.R. at 611.

8. Supp.R. at 679–82. Regarding the actual shooting, Crane testified as follows:

He alleged that when Tawana got out of the car, quote, "she didn't say much. She was just standing there, smiling," end of quote. He admitted that he had drawn his weapon at the time because he said he had heard some shots. He alleged that he then fired two rounds, quote, "I guess at the ground," unquote. When asked why he would do so, he responded, quote, "Because I was nervous," end of quote. Supp.R. at 670.

9. Crane testified that he relied on Taylor's statements regarding the events of the crime in making his assessment. Supp.R. at 669. Even defense expert Wilson conceded on cross-examination that any physician would have to discuss the shooting in order to determine whether Taylor was dissociated at that time. Supp.R. at 643.

and also Mr. Taylor had threatened to kill her if she talked to anyone.

R. at 1691–92.

█ In Indiana's courts, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." *Lannan v. State* (1992), Ind., 600 N.E.2d 1334, 1336 n. 4 (adopting Fed.R.Evid. 404(b)). If a court finds that the evidence was "offered to prove something other than the defendant's bad character or propensity to commit the charged crime," it must then determine whether its prejudicial impact substantially outweighs its probative value. *Hardin v. State* (1993), Ind., 611 N.E.2d 123, 128 (adopting Fed.R.Evid. 403).

█ The State introduced the information to demonstrate Taylor's motive for killing Tawana. Its theory was that Taylor became so angry at Tawana and Phyllis for accusing him of child molesting that he lashed out at them.[10] While evidence of past sexual misconduct with children may be highly prejudicial, its probative value in this case was not substantially outweighed. We note that the State did not present details of alleged acts of abuse, but properly focused on the fact that the charges were made.[11] The trial court acted within its discretion in admitting this evidence.

█ On the other hand, Officer Endres' testimony about Tawana's statements presents a related, but different, problem. Generally, a witness may not testify about out-of-court statements to prove the truth of the matter asserted. If the officer's statement was offered to prove that Taylor actually threatened or intended to kill Tawana, then it was hearsay.

There are, of course, recognized exceptions to this rule. We have permitted testimony regarding the victim's state of mind to show the intent of the victim to act in a particular way. *Carter v. State* (1986), Ind., 501 N.E.2d 439, 441–42, (citing *Mutual Life Ins. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892)); *see also Dunaway v. State* (1982), Ind., 440 N.E.2d 682, 686 ("The statements indicate a fearful state of mind which would circumstantially explain her later action of attempting to hit defendant."). Such evidence is also admissible where the defendant puts the victim's state of mind in issue. *See Lock v. State* (1991), Ind., 567 N.E.2d 1155, 1159–60, *cert. denied,* 503 U.S. 991, 112 S.Ct. 1686, 118 L.Ed.2d 400 (1992) ("We find that the statements made by the victim were properly admitted to prove that the relationship between the daughter and the victim was not completely benign, contrary to Lock's assertions at trial."). Finally, we have allowed such testimony in limited circumstances to explain physical injuries suffered by the victim at the hands of the defendant. *See Nicks v. State* (1992), Ind., 598 N.E.2d 520.

█ Officer Endres's testimony about Tawana's statements is mixed hearsay and non-hearsay, and therefore does not clearly fall into any category. The first part of her statement, regarding the victim's state of mind, comes within the named exceptions to the hearsay rule. The second part, that Taylor had threatened to kill Tawana in order to quiet her, related to Taylor's conduct and therefore is inadmissible hearsay. That

---

10. Other evidence also supported this theory. Renica Johnson, for example, testified that Taylor phoned Tawana only hours before the shooting, complaining about the charges. R. at 1425. Both Renica and Nicole Durham testified that just before Taylor killed Tawana, he screamed at her: "Why did you lie to me? Why did you lie to me?" R. at 1360, 1432–33. And, Renica testified that he could have said, "Why did you lie on me?" R. at 1364. Phyllis Smith testified that the defendant called her a "meddling bitch" before he attacked her. R. at 1375. As we have seen, the State also introduced the letter written by Taylor in which he reveals that his motivation stemmed from the charges. R. at 1690.

11. In its brief, the defense also alludes to its objection before the trial court that the alleged criminal acts took place years before. This is irrelevant to the purposes for which the State introduced the evidence. The State contends that the accusation moved Taylor to violence, and the accusation was leveled only two months before the shooting.

statement should have been excluded or stricken.

▮ Whether the admission of that single sentence requires reversal, however, is another matter.[12] We conclude the error was harmless because its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Fleener v. State* (1995), Ind., 656 N.E.2d 1140.

The eyewitness testimony of Renica Johnson and Nicole Durham that Taylor singlemindedly searched for Tawana while brandishing a .38 caliber revolver is evidence of intent to kill, and Nicole's testimony regarding Tawana's telephone conversation with Taylor earlier that evening yielded evidence that Taylor was enraged because of the child molestation charges. Additionally, Taylor's letter to Cathy Smith,[13] written prior to the murder, clearly demonstrates Taylor's hostile animus towards Tawana and Phyllis Smith. Taylor wrote: "[T]oday we are all going to die. I'm going to send these witches to hell and I'm going too. Just to make sure they never raise [sic] again. [G]oing to miss you[,] Zake and Rhon." R. at 1628 (word stricken in original omitted). The record thus contains ample evidence that Taylor intended to kill Tawana and Phyllis in order to exact revenge.

Taylor wrote the words "today we are going to die" before arriving at Phyllis Smith's apartment.[14] The State also provided evidence of Taylor's sanity via expert testimony. Incontroverted evidence showed that Taylor fled to Georgia after he attacked Tawana and Phyllis. These acts certainly demonstrated his appreciation of the wrongfulness of his conduct. The jury clearly understood that mental illness and insanity were important issues; it weighed the conflicting expert testimony, eventually concluding that Taylor was mentally ill.[15] In light of the evidence and the jury verdicts, we conclude that Taylor was not unfairly prejudiced by the admission of the officer's statement.

### IV. Conclusion

For the reasons stated, we affirm the convictions.

DICKSON, SULLIVAN and SELBY, JJ., concur.

DeBRULER, J., dissents with separate opinion.

DeBRULER, Justice, dissenting.

In *Mahaffey v. State* (1984), Ind., 459 N.E.2d 380, this Court held that when the defendant in a criminal case files notice of the intent to interpose the defense of insanity, such defendant "initiates" his psychiatric examination by two court-appointed physicians, thereby waiving his privilege against self-incrimination with respect to them. We said, "Appellant himself in effect requested the mental examination, and therefore he may not complain that his privilege against self-incrimination was violated." *Id.* at 382. In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the United States Supreme Court, referring to mental examinations, held that once "a defendant requests such an evaluation or presents psy-

---

12. In a trial transcript where the taking of evidence consumed 889 pages, 329 pages were devoted to expert testimony and 268 to the insanity defense.

13. *See* note 1, *supra*.

14. Additionally, in its reference to nobody being home at Cathy Smith's apartment, Taylor's letter supports the inference that he took the revolver used to kill Tawana and injure Phyllis from Cathy Smith's apartment. Smith testified that Taylor had keys to her apartment, that she had taken the children out for pizza early that evening, that Taylor took her car without explanation that night, and that she discovered the revolver to be missing two days after the murder, but that she did not know when it was taken. Insofar as the tone of Taylor's letter resembles a suicide note in its explanation of events yet to come, it follows that Taylor planned his attack on Tawana and Phyllis, took the gun and car in order to implement it, and then tried to justify it prior to execution.

15. The most substantial weakness in Taylor's insanity defense was the inability of his expert witnesses to cite any objective evidence to support their conclusion that Taylor suffered from a dissociative state ("Viet Nam flashback") on the night in question. The only evidence supporting their opinions was the ever-changing story Taylor told while he was jailed and awaited trial.

chiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Id.* at 422–23, 107 S.Ct. at 2918–19. In light of these holdings, it cannot be said that an Indiana criminal defendant, by nothing more than simply interposing the defense of insanity, "initiates" a psychiatric examination by other than the required two court-appointed psychiatrists, and therefore waives the privilege against self-incrimination at any other such mental examination. The proof presented by court-appointed psychiatrists is not the defendant's proof—it is that of the Court. *See* Ind.Code Ann. 35–36–2–2 (Burns 1994). If the defendant proposes to introduce his own proof on the issue of insanity, a stronger case for waiver would be present; however, such is not the case here. I would hold that the testimony of Dr. Crane was inadmissible as his examination was not preceded by a valid waiver by appellant of the privilege against self-incrimination.

Furthermore, in reference to the hearsay claim, the State could have stopped after introducing the earlier charging informations in support of their theory that appellant killed in retaliation for the victim's complaint. It did not. Over a hearsay objection, Officer Endress was permitted to repeat what Tawana Smith, the victim, had said when asked why she had waited so long in seeking those charges:

> She said she was scared to tell, thinking no one would believe her, and also Mr. Taylor had threatened to kill her if she talked to anyone.

This answer is devastating to appellant's insanity defense, and the error in permitting the jury to consider it was not harmless.

This conviction should be reversed and a new trial ordered.