STATE of Indiana, Appellant–Plaintiff,

v.

Darnetta FIGGURES, Appellee–Defendant.

No. 02A04–0506–CR–345.

Court of Appeals of Indiana.

Dec. 28, 2005.

Rehearing Denied March 13, 2006.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, for Appellant.

Anthony S. Churchward, Deputy Public Defender, Fort Wayne, for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

The State appeals the trial court's grant of Darnetta Figgures' motion to suppress evidence.

We affirm.

### ISSUE

Whether the trial court erred when it granted Figgures' motion to suppress evidence.

### FACTS

On December 12, 2003, Officer James Branum of the City of Richmond Police Department sought two search warrants for two residences in Wayne County, Indiana, based on an investigation by the Wayne County Drug Task Force conducted from September to December of 2003. According to the investigation, two brothers, James Curry and Henry Lee Watkins, were trafficking crack cocaine together from their residences—Curry at 220½ N. 12th Street; Watkins at 214 N. 12th Street, Apt. # A. The affidavit for the search warrants contained information about a controlled buy from Curry at 220½ No. 12th Street and complaints of drug dealing there, as well as information from confidential informants that on numerous occasions they had seen Watkins cook powder cocaine into crack cocaine at his residence at 214 N. 12th Street, Apt. # A. Conspicuously absent from the affidavit is any implication that Figgures was present or involved in any manner in dealing drugs; in fact, the affidavit contained no mention whatsoever of Figgures. The details of the affidavit will be further discussed later in the opinion.

Branum's affidavit requested permission to "seize all property used in the trafficking of crack cocaine, including ... any records, receipts, moneys, and other documents that relate to the trafficking of cocaine." (Ex. A). Based on Branum's affidavit, the trial court granted a warrant authorizing the police to enter Watkins' residence at 214 N. 12th Street, Apt. # A, to search for and seize "crack cocaine and records pertaining to the sale of crack cocaine." (Ex. B). This warrant was issued in the cause of *State of Indiana v. Henry Lee Watkins* and no other person[s] were named in the warrant.

Officer William Shake of the Wayne County Drug Task Force was involved in the execution of the search warrant. In searching for records pertaining to the sale of crack cocaine, Shake looked for "anything from a little piece of paper that has ... name[s] and dollar amounts to more intricate record keeping," and items, such as mail, that indicate proof of residency. (Tr. 12). As he searched the front bedroom of the residence, which the record indicates was occupied by Figgures and her husband Credell Henry,[1] Shake looked inside some opaque Rubbermaid stackable drawers. He found and seized two bank statements from two different banks. The bank statements were in the names of Credell Henry and Figgures, and both were dated September 30, 2003. One statement showed a balance of $48.09, and the other showed a balance of $4,014.24. Shake also found pieces of mail addressed to Figgures from Wayne County Office of

---

1. The Search Warrant Return named Credell Henry as a suspect after searching the residence, and among the items listed seized were various pieces of identification, three of which are in the name of Henry Lee Watkins. (Ex. C.) Whether Credell Henry and Henry Lee Watkins are one and the same is not revealed in the record and, thus, remains unknown.

Family and Children ("OFC") in the bedroom. Until viewing this mail, Shake was unaware that Figgures was a recipient of public assistance.

After the search and opening of Figgures' mail, Shake called Elizabeth Maddox, who was Figgures' caseworker at OFC, about the information discovered in the search. Shake then forwarded copies of the police reports to her, as well as the bank statements and the piece of OFC mail (a benefits statement). Maddox turned the packet of information over to OFC fraud investigator Dianna Shoemaker. When Shoemaker received the information, she discovered that Figgures had not reported the bank accounts and that the balances exceeded the limit permitted for public assistance. She therefore sought subpoenas to obtain Figgures' records from the banks. As a result, OFC received copies of Figgures' savings and money market account reports revealing "she had money in the accounts under her name during the time she received public assistance." (App.10). Figgures had a savings account in her name with a balance of $4,023.07 and was listed as a co-owner of a money market account with a balance of $8,019.37. The suppression of this evidence is the subject of this appeal.

The State charged Figgures with one count of welfare fraud, a class C felony, regarding her receipt of food stamps; one count of welfare fraud, a class D felony, regarding her receipt of temporary assistance; and one count of Medicaid fraud, a class D felony. Figgures filed a motion to suppress evidence on February 23, 2005. The court conducted a hearing on March 16, 2005, and granted the motion on April 4, 2005. The court found that neither the warrant nor the probable cause affidavit in support of the warrant contained a reference to Figgures, that neither the warrant nor the probable cause affidavit in support of the warrant referred to any bookkeeping procedure or banks used by Curry or Watkins or any other individuals, and that the warrant lacked "adequate specificity to justify the seizure and 'admission into evidence' of the bank records ..." of Figgures. (App.25).

## DECISION

■ The State, appealing from negative judgment, has the burden of demonstrating that the trial court's grant of Figgures' motion to suppress was contrary to law. *See State v. Phillips*, 828 N.E.2d 441, 442 (Ind.Ct.App.2005). "We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court." *Id.* "This court neither reweighs evidence nor judges the credibility of witnesses." *Id.* "Rather, we consider the evidence most favorable to the judgment." *Id.*

The State argues that the search warrant is valid because it sufficiently described the items to be seized. The State also contends that even if the warrant was determined to be invalid, the "officers relied upon the warrant in good faith when executing the search." (State's Br. 6). Figgures maintains that the warrant was a general one, failing to describe with particularity the items to be seized, leaving discretion to the executing officer. Furthermore, Figgures asserts that the good faith exception does not apply herein.

■ Both the Fourth Amendment of the U.S. Constitution and Art. 1, Section 11 of the Indiana Constitution require that warrants particularly describe the place to be searched and the persons or things to be seized. U.S. Const. amend. IV; Ind. Const. Art. 1, § 11. This requirement prohibits general warrants, which prevents " 'a general, exploratory rummaging in a person's belongings' " and " 'the seizure of

one thing under a warrant describing another.'" *Warren v. State*, 760 N.E.2d 608, 610 (Ind.2002) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965)). "A warrant that leaves the executing officer with discretion is invalid." *Warren*, 760 N.E.2d 608, 610 (citing *Hester v. State*, 551 N.E.2d 1187, 1190 (Ind.Ct.App.1990)).

■ "While the items to be searched for and seized must be described with some specificity, there is no requirement that there be an exact description." *Overstreet v. State*, 783 N.E.2d 1140, 1158–59 (Ind.2003) (citing *Phillips v. State*, 514 N.E.2d 1073, 1075 (Ind.1987)). In this case, the warrant authorized the executing officer to search for and seize "crack cocaine and records pertaining to the sale of crack cocaine." (Ex. B). Since enumerating a precise list of documents may be impossible to do, the specification of records pertaining to the sale of crack cocaine is sufficient to encompass bank records such as a bank statement. *See United States v. Vanichromanee*, 742 F.2d 340, 347 (7th Cir.1984) (holding that a warrant authorizing a search of an attaché case for "documents, papers, receipts, and other writings which are evidence of a conspiracy to violate Title 21, U.S.C., Section 963 [conspiracy to import heroin]" was not overly broad). Thus, searching for records pertaining to crack sales by Curry and Watkins may include looking at, and perhaps even seizing, relevant bank statements. Because the warrant was sufficiently specific in its description of the kind of records to be searched for, and the affidavit described whose crack sales were to be investigated, the warrant was valid to search and seize "crack cocaine and records pertaining to the sale of crack

cocaine" by Curry and Watkins. However, our analysis does not end there.

■ The search warrant in question was issued in order to investigate the residence of Henry Watkins at 214 N. 12th Street, Apt. # A, based on evidence that he and his brother, James Curry, were trafficking crack cocaine. According to the affidavit, the officers had been receiving "complaints of drug dealing" from Curry's residence since September 3, 2003, and they had observed known crack abusers leave Curry's residence. (Ex. A). The affidavit further stated that the officers had learned about Curry's criminal history, including prior arrests for narcotics possession and dealing cocaine.

According to the affidavit, confidential informants disclosed information that Curry and Watkins were selling crack out of their apartments. One C.I. divulged details regarding where the brothers were from, where they procured the cocaine, and where they sold the crack. She also agreed to make a controlled buy from Curry, but when the C.I. arrived at his residence, no one was home. Another C.I. reported that she had been to Curry's residence at least eighty times to purchase crack, that she had been to Watkins' residence at least fifteen times, and that she had seen Watkins cook the powder cocaine into crack approximately seven times. She also described the method the brothers used to communicate to one another about the crack sales.

The affidavit also described a controlled buy from Curry at his residence on December 12, 2003. Officers Shake and Britt met with another C.I. who told them that she had purchased crack from Curry twenty-five to fifty times, smoked crack with Curry approximately fifteen times, and was present on December 9, 2003, when Watkins was cooking powder cocaine into crack at his apartment. The C.I. per-

formed the controlled buy at Curry's residence and afterwards turned over to the officers a substance that tested positive for the presence of cocaine. She then gave a post-buy statement: a cousin of Curry and Watkins answered the door and called to Curry, who produced a chapstick container containing several pieces of crack and gave the C.I. some in exchange for the $20 provided by the officers. Based on this information, search warrants were issued for both 220½ N. 12th Street and 214 N. 12th Street, Apt. # A. Notably, the search warrant affidavit completely focuses on the illicit activities of *Curry* and *Watkins*. All the evidence amassed in the task force's investigation pertains solely to the two brothers, except for a brief mention of their cousin. No evidence presented in the affidavit implicates Figgures; her name appears nowhere in the affidavit; and there is no reference to her whatsoever in the search warrant nor evidence of her presence or involvement in dealing in drugs at any time.

■■■ Figgures was neither suspected of dealing drugs during the investigation nor a target of the search and did nothing to render herself amenable to the privacy invasion of having her mail opened and read by police officers looking in her bedroom for evidence of crack sales by Watkins and Curry. Under Federal Fourth Amendment analysis, a privacy expectation exists when the defendant exerts control or ownership over the premises searched. *Peterson v. State*, 674 N.E.2d 528, 532 (Ind.1996) (citing *Lee v. State*, 545 N.E.2d 1085, 1091 (Ind.1989)). Jurisprudence in Indiana based on Article 1, Section 11 of the Indiana Constitution establishes that the " 'right "to be secure in their persons, houses, papers and effects, against unreasonable search and seizure" [under Section 11] is a personal right of the individual whose person, house, papers or effects are searched or seized.' " *Id.* at 533–34 (quoting *Snedegar v. State*, 196 Ind. 254, 146 N.E. 849, 849–50 (1925)).

The record indicates that the mail from OFC belonged to Figgures, not Watkins, and, as such, she had a reasonable expectation of privacy. When Shake realized that Watkins was not the sole resident of 214 N. 12th Street and that Figgures occupied a bedroom, he should have refrained from opening and reading Figgures' mail. Bank statements may have relevance to records pertaining to the sale of crack, but when Shake opened and began reading Figgures' mail from OFC and seized and read her bank statements, he was no longer looking at records related to the investigation of Watkins' crack sales. Figgures' mail was irrelevant to the criminal activity being investigated and alleged in the search warrant and, therefore, was outside the warrant's scope. While the warrant empowered the police to search for and seize records pertaining to the sale of crack cocaine in the investigation of Watkins, it did not authorize any general, exploratory search of Figgures' personal mail.

■■ Furthermore, the plain view doctrine may not be invoked to justify the seizure of Figgures' mail. According to the plain view doctrine,

an officer may seize incriminating evidence without a warrant when two conditions are met. First, the officer must have otherwise complied with the Fourth Amendment. This means that "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."

*Taylor v. State*, 659 N.E.2d 535, 538 (Ind. 1995) (quoting *Horton v. California*, 496 U.S. 128, 137, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). "Second, the incriminating

nature of the evidence must have been immediately apparent." *Id.* (citing *Horton,* 496 U.S. at 136, 110 S.Ct. 2301).

■■■■■ Shake was in the residence lawfully by virtue of the search warrant, which gave him access to the bedroom. However, the incriminating nature of the bank statements and the mail was not immediately apparent, leaving the second requirement unfulfilled. "The 'immediately apparent' prong of the plain view doctrine requires that law enforcement officials have probable cause to believe the evidence will prove useful in solving a crime." *Id.* "[T]his does not mean that the officer must 'know' that the item is evidence of criminal behavior." *Id.* at 539 (citing *Texas v. Brown,* 460 U.S. 730, 741, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). "Probable cause requires only that the information available to the officer would lead a person of reasonable caution to believe the items could be useful as evidence of a crime." *Id.* (citing *Texas v. Brown,* 460 U.S. at 742, 103 S.Ct. 1535). " 'A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.' " *Id.* (citing *Texas v. Brown,* 460 U.S. at 742, 103 S.Ct. 1535). " '[A] lawful seizure must be based upon a "nexus" between the item seized and particular criminal behavior. The "nexus" must be one known to the officers at the time of the seizure and may not be based upon mere speculation.' " *McReynolds v. State,* 460 N.E.2d 960, 963 (Ind.1984) (quoting *United States v. White,* 660 F.2d 1178, 1184 (7th Cir.1981)). The facts in the instant case contain no such nexus.

The record does not reflect any evidence that would indicate that the mail from OFC addressed to Figgures and the bank statements in her name were so manifestly incriminating in nature as to justify seizure and spawn a second investigation wholly removed from the initial investigation of the alleged drug dealing by Curry and Watkins. At the time of the search, had the mail and bank statements been previously opened and the contents therein exposed overtly displaying Figgures' status at OFC at the time the bank statements were dated, then perhaps an officer could make a common-sense determination that the documents were possibly linked to criminal activity. Here, however, the record does not indicate such circumstances. Further, the record does not reveal details about what engendered the suspicion that they were evidence of welfare fraud—the bank statements were dated almost three months prior to the date of the execution of the search warrant, and the date of the benefits statement is not provided. Given this lack of information, the record reveals no clear nexus between the bank statements, mail, and criminal activity by Figgures. Mail addressed to Figgures from OFC could not be a record of Watkins' crack sales and, therefore, the police had no cause to open the mail and inspect its contents. The seizure of the bank statements and the mail was based on mere speculation of their linkage to criminal activity by Figgures, rendering the "immediately apparent" prong of the plain view doctrine unfulfilled. Therefore, we cannot say that the trial court's decision to grant Figgures' motion to suppress was contrary to law. .

■■■■■ Because the seizure of Figgures' mail and bank statements was illegal, any evidence produced as a result should be suppressed. "[U]nder normal Fourth Amendment principles, evidence obtained in the course of an illegal search is not admissible in a subsequent criminal proceeding." *Adams v. State,* 762 N.E.2d 737, 745 (Ind.2002) (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and *Wong Sun v. United States,* 371

U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

When applied, the [fruit of the poisonous tree] doctrine operates to bar not only evidence directly obtained, but also evidence derivatively gained as a result of information learned or leads obtained during an unlawful search or seizure. To invoke the doctrine, a defendant must show that challenged evidence was obtained by the State in violation of the defendant's Fourth Amendment rights.

*Adams,* 762 N.E.2d at 737 (quoting *State v. Farber,* 677 N.E.2d 1111, 1114 (Ind.Ct. App.1997)). Because the illegal search and seizure of Figgures' mail and bank statements were the basis for the subsequent fraud investigation by OFC, Figgures' bank account records obtained through OFC's subpoenas to the banks are fruit of the poisonous tree and must be suppressed.

 Nevertheless, the State asserts that even if the seizure was found unlawful, the good faith exception applies. We disagree.

The good faith exception is codified in Indiana Code section 35–37–4–5: "Admissibility of evidence obtained by search or seizure conducted in good faith." The statute provides that evidence may not be excluded "on the grounds that the search or seizure by which the evidence was obtained was unlawful if the evidence was obtained by a law enforcement officer in good faith." Ind.Code § 35–37–4–5. The statute provides, in pertinent part, that for the good faith exception to apply, the evidence must be obtained pursuant to "[a] search warrant that was properly issued upon a determination of probable cause by a neutral and detached magistrate, that is free from obvious defects other than nondeliberate errors made in its preparation, and that was reasonably believed by the law enforcement officer to be valid[.]" *Id.*

Although we find that the warrant was valid, we find that the officers were acting outside the scope of the warrant in opening and reading a letter to Figgures from OFC and the seizure and opening of her bank statements, which could have no link to crack sales by Watkins and whose illegality was not immediately apparent. Therefore, the good faith exception cannot apply.

Affirmed.

SHARPNACK, J., and BAILEY, J., concur.