STATE of Indiana, Appellant–Plaintiff,

v.

Charles TUNGATE and William
Reynolds, Appellees–
Defendants.

No. 39A01–0807–CR–341.

Court of Appeals of Indiana.

Dec. 31, 2008.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Jennifer A. Joas, Joas & Stotts, Madison, IN, Attorney for Appellees.

## OPINION

ROBB, Judge.

### Case Summary and Issue

In this consolidated appeal[1] involving several drug-related and theft charges, the trial court suppressed evidence seized from Charles Tungate and William Reynolds (the "Defendants") because the warrants authorizing the seizure of such evidence were not supported by probable cause. On appeal, the State raises the sole issue of whether the trial court properly concluded the warrants were not supported by probable cause. Concluding that there was probable cause to search some, but not all, of the areas described in the warrants, we affirm in part and reverse in part. We also address the proper standard of review to apply in cases such as this where the trial court suppresses evidence after a magistrate determined there was probable cause to issue a warrant.

### Facts and Procedural History

On September 9, 2006, Indiana State Police Trooper Michael Caplinger received information from a colleague that Barry Lauber, an employee with the Rural Electric Membership Corporation, reported that one of his subordinates recently "discovered an unauthorized electric meter . . . while in the course of his duties inspecting the kilowatt usage on the authorized electric meter" servicing property in Jefferson County owned by Sheila Shirley. Appellant's Appendix at 30. The colleague also told Trooper Caplinger that Lauber reported the unauthorized meter displayed the identification number "7030" and had been "retired from service in 1986 after having been disappeared [sic] from its installed location in Franklin County. . . ." *Id.* On September 11, 2006, Trooper Caplinger drove by the Shirley property and observed a white farmhouse, "a red dilapidated barn to the west of the [farmhouse,] and a white camper trailer sitting directly against the west side of the barn with no space in between and [ ] a light on in the camper." *Id.* at 31. The next day, Trooper Caplinger spoke with John Huffman, also an employee with Rural Electric, who had visited the Shirley property on September 7, 2006, in response to the earlier discovery by Lauber's subordinate. During his visit, Huffman observed two active electric meters on the property. Huffman determined that one of them ran electricity to the farmhouse, while the other, which Huffman reported as displaying the identification number "7030," had an extension cord connected to it that ran into the barn. *Id.* at 32.

---

1. We initially entered an order denying the State's motion to consolidate, but rescinded that order on November 24, 2008, on the grounds that it had been improvidently denied.

Believing that his observations along with those of Huffman and Lauber's subordinate constituted probable cause to search for evidence of electricity theft, on September 13, 2006, Trooper Caplinger prepared an affidavit containing the foregoing information and requesting entry into the barn and the camper trailer to search for the 7030 electric meter, as well as other "items used to facilitate the theft of services including junction boxes, extension cords, electric wire, breaker boxes, service breakers, and items being used to facilitate the delivery of electric current to operate appliances/equipment." *Id.* A magistrate granted Trooper Caplinger's request the same day, and, later that afternoon, Trooper Caplinger and ten other troopers [2] drove in a multi-vehicle caravan to the Shirley property to execute the warrant.

Trooper Caplinger arrived at the Shirley property one to three minutes after several troopers had entered the farmhouse. According to the trial court, these troopers entered by "us[ing] a battering ram to knock down the front door." *Id.* at 64. Once inside, the troopers found Shirley and Reynolds and observed numerous firearms, drug paraphernalia, counterfeit currency, and materials and equipment used to manufacture methamphetamine. Around the time the troopers entered the farmhouse, other troopers assigned to secure the rest of the property found Tungate inside the white camper trailer. After the three had been detained, Caplinger and several others entered the barn and observed numerous firearms, a truck and a motorcycle with altered VIN numbers, and

materials and equipment used to manufacture methamphetamine. The troopers also discovered a marijuana plant and methamphetamine-related materials in the yard; materials and equipment used to manufacture methamphetamine in a "cave" that had been dug out along the bank of a nearby creek, Defendant's Ex. B at 58–59; and a tan camper next to the barn that Trooper Caplinger had not noticed during his September 11, 2006, drive-by of the property because it was not visible from the road.

Approximately three hours after executing the warrant, Trooper Caplinger sought and received another warrant authorizing him to enter the farmhouse, barn, and tan camper and seize the evidence the troopers had already observed. Trooper Caplinger's execution of the warrants yielded over 185 separately marked items of evidence.

As for seizing evidence of electricity theft, after the Shirley property had been secured, a Rural Electric employee removed the electric meter that had been previously identified as displaying the number "7030." The employee determined, however, that this meter had not been stolen—both Huffman and Lauber's subordinate had misread the identification number [3]—but nevertheless had been deactivated at some point by Rural Electric and later reactivated without authorization.

On September 15, 2006, the State charged the Defendants with several methamphetamine-related and theft offenses, among others.[4] On November 1, 2006,

---

2. Trooper Caplinger's report states that the group consisted of six troopers, three detectives, and a sergeant. We will refer to the group generically as "troopers" for the sake of brevity.

3. Lauber testified during his deposition that the meter's identification number was in fact "7037." Defendant's Ex. B at 9.

4. Specifically, the State charged each defendant with manufacture of methamphetamine, a Class A felony; possession of methamphet-

Tungate filed a motion to suppress, and Reynolds followed suit nearly a year later. On April 22, 2008, the trial court conducted a hearing on the Defendants' motions, during which it heard testimony from Trooper Caplinger and admitted into evidence the warrants, Trooper Caplinger's affidavits supporting the warrants, and several deposition transcripts, including those of Lauber and Trooper Caplinger. On May 21, 2008, the trial court ordered that "the items seized by the State . . . in arresting the Defendants . . . and executing the two search warrants in this case shall be suppressed. . . ." *Id.* at 65. The State now appeals.

### Discussion and Decision

#### I. Standard of Review

■■■ The Fourth Amendment to the United States Constitution states in relevant part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In determining whether there is probable cause to issue a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Courts reviewing such a decision should determine whether the magistrate had a "substantial basis" to conclude that probable cause existed. *Id.* at 238, 103 S.Ct. 2317 (quoting *Jones v.*

*United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). "A substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause." *State v. Spillers,* 847 N.E.2d 949, 953 (Ind.2006). "Reviewing court" means not only the trial court's ruling on a motion to suppress, but also an appellate court's review of the trial court's ruling. *Id.* In conducting this review, we consider only the evidence presented to the magistrate and not post hoc justifications for the search. *Edwards v. State,* 832 N.E.2d 1072, 1077 (Ind.Ct.App.2005).

■■■ We pause here to note that the foregoing standard of review is not the one the parties urge us to apply, claiming instead that the proper standard is whether the trial court's decision was contrary to law. This court has stated repeatedly that when the trial court grants a motion to suppress, the State is appealing from a negative judgment and bears the burden of establishing that the trial court's decision was contrary to law. *See, e.g., State v. Rucker,* 861 N.E.2d 1240, 1241 (Ind.Ct. App.2007), *trans. denied; State v. Figures,* 839 N.E.2d 772, 776 (Ind.Ct.App. 2005), *trans. denied; State v. Farber,* 677 N.E.2d 1111, 1114 (Ind.Ct.App.1997), *trans. denied.* The problem with this rule of application is that the State is not always appealing from a negative judgment when the trial court grants a motion to suppress. An appeal from a negative judgment occurs when the trial court denies relief to the party that had the burden

amine, a Class C felony; possession of ephedrine while in possession of a firearm, a Class C felony; possession of methamphetamine precursors, a Class D felony; counterfeiting, a Class C felony; and two counts of theft (one relating to electricity and one relating to the truck and motorcycle), both Class D felonies.

Trooper Caplinger's report states that Shirley was arrested on suspicion of having committed the same offenses as the Defendants. Shirley is not a party to this appeal, however, and the record does not indicate whether any criminal charges were filed against her.

of proof. *See Ben–Yisrayl v. State,* 738 N.E.2d 253, 258 (Ind.2000), *cert. denied,* 534 U.S. 1164, 122 S.Ct. 1178, 152 L.Ed.2d 120 (2002). The State, however, does not always have the burden of proof when a defendant seeks to suppress evidence on Fourth Amendment grounds. Generally speaking, placement of the burden turns on whether the State obtained a warrant. *See Malone v. State,* 882 N.E.2d 784, 786 (Ind.Ct.App.2008). If so, the burden is on the defendant; otherwise, the State bears the burden of establishing that an exception to the warrant requirement applies. *See id.* With these principles in mind, we apply the "substantial basis" standard of review because the State obtained a warrant before conducting its search of the Shirley property and therefore is not appealing from a negative judgment. *See Spillers,* 847 N.E.2d at 952–53 (applying the "substantial basis" standard of review where the trial court granted the defendant's motion to suppress after a magistrate had determined there was probable cause to issue a warrant).

## II. Propriety of Trial Court's Decision [5]

■ Trooper Caplinger searched five areas of the Shirley property: the farmhouse, the barn, the white camper trailer, the tan camper, and the "curtilage" area of the property, which we will assume for purposes of this opinion includes the yard and the cave that was discovered near the creek.[6] "As a general proposition, a search of multiple units at a single address must be supported by probable cause to search each unit and is no different from a search of two or more separate houses." *Figert v. State,* 686 N.E.2d 827, 830 (Ind. 1997). As far as we can tell from its brief, the State only appears to challenge the trial court's decision to suppress evidence seized from the barn, the white camper trailer, and the tan camper, but not from the farmhouse or curtilage area of the property.[7] As such, we will only address

5. As the standard of review indicates, the following analysis addresses the propriety of the trial court's decision (and by extension the propriety of the magistrate's decision) under the Fourth Amendment. We note, however, that at the suppression hearing and on appeal, the parties, as well as the trial court in its order, intersperse Fourth Amendment analysis with that of state law analogues, such as Article I, Section 11, of the Indiana Constitution and various provisions of the Indiana Code relating to warrants and probable cause affidavits. Although we recognize these state constitutional and statutory provisions are not necessarily coextensive with the Fourth Amendment, *see State v. Brown,* 840 N.E.2d 411, 414–15 (Ind.Ct.App.2006); *Best v. State,* 821 N.E.2d 419, 430 (Ind.Ct.App.2005), *trans. denied,* we nevertheless note that our conclusion below regarding the propriety of the trial court's decision under the Fourth Amendment also applies to the propriety of the trial court's decision under state law provisions, *cf. Sowers v. State,* 724 N.E.2d 588, 591 (Ind. 2000) (concluding a search was valid under Article I, Section 11, of the Indiana Constitution "[f]or the same reasons" it was valid

under the Fourth Amendment), *cert. denied,* 531 U.S. 847, 121 S.Ct. 118, 148 L.Ed.2d 74 (2000).

6. We note as an aside that the scope of the curtilage area of a particular piece of property is determined on a case-by-case basis and that such a determination is significant because the curtilage receives the same Fourth Amendment protections as the residence it surrounds. *See Holder v. State,* 847 N.E.2d 930, 936 (Ind.2006). However, because we conclude below that the State does not challenge the trial court's decision to suppress evidence seized from portions of the Shirley property that arguably could be described as within the curtilage (i.e., the yard and the cave), our assumption that those areas are within the curtilage does not affect the propriety of the trial court's decision to suppress evidence seized from those areas.

7. The State's failure to challenge evidence suppressed from the farmhouse is well-taken because the first warrant did not authorize entry into the farmhouse, which is an area that the Fourth Amendment affords the great-

the propriety of the trial court's decision with respect to the former three areas of the Shirley property and assume, based on the absence of any argument by the State, that the trial court properly suppressed evidence seized from the farmhouse and the curtilage.

 We start our analysis by noting that the trial court's decision to suppress evidence seized from the barn, white camper trailer, and tan camper were based on three erroneous findings, two of which are contrary to Fourth Amendment case law and one of which overlooked some reliable hearsay contained in Trooper Caplinger's first affidavit. Turning first to the findings that are contrary to case law, the trial court invalidated the first warrant in part because Trooper Caplinger's affidavit contained incorrect information regarding the electric meter's identification number and because the search for evidence of electricity theft was merely a pretext to search for evidence of drug activity. Regarding the first finding, "[m]istakes and inaccuracies in search warrant affidavits will not 'vitiate the reliability of the affidavits so long as such mistakes were innocently made,'" *Mitchell v. State*, 745 N.E.2d 775, 785 (Ind.2001) (quoting *Utley v. State*, 589 N.E.2d 232, 236–37 (Ind. 1992)), and the party alleging that the mistakes were not innocent must make a substantial showing that the facts were included in reckless disregard for the truth, *id.* During the suppression hearing, the Defendants did not present any evidence to show that either Lauber's subordinate or Huffman intentionally misread the meter's identification number or that Trooper Caplinger knew these employees had misread the identification number and intentionally omitted such information from the affidavit.[8] As such, the incorrect information regarding the meter's identification number cannot serve as a basis for

---

est degree of protection against government intrusion. *See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed...."). The State's failure to challenge evidence suppressed from the yard and the cave, however, is somewhat perplexing, as it appears to have at least a colorable argument under the rule articulated by our supreme court in *Houser v. State*, 678 N.E.2d 95, 101 (Ind.1997) (citing *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)).

8. This does not mean the Defendants did not try to elicit such evidence from Trooper Caplinger. Indeed, during the suppression hearing, Trooper Caplinger was questioned several times regarding whether he knew the meter's identification number was incorrect when he prepared the first affidavit, but his testimony on that point indicates that he was simply relating what his colleague and Huffman had told him and that if he had known the meter had been misread, he would have included that information in the affidavit. *See* Transcript at 22–23 ("[The State]: [W]as there any effort to mislead [the magistrate] given what you know now subsequent to executing the search warrant that there was a discrepancy between the numbers on the meter that you received from [Rural Electric] and what you actually observed on the [m]eter itself? A. Absolutely not. Had I known what the actual number was on the meter, that's what I would have put in the affidavit."); *id.* at 27 ("[Counsel for Reynolds]: And as it turns out, none of those things [ (i.e., that the meter had been stolen and that its identification number was 7030) ] were accurate. Is that right? A. That's true. Q. So all of the things that you learned on that date and put in this affidavit were not true? A. [W]hen I offered this affidavit, I was acting in good faith that what information they had provided me was true and accurate.").

invalidating the first warrant. The trial court's finding that the search for evidence of electricity theft was a pretext also cannot serve as a basis for invalidating the first warrant because a law enforcement officer's subjective intent is irrelevant when determining the existence of probable cause. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *cf. United States v. Van Dreel,* 155 F.3d 902, 905 (7th Cir.1998) ("That the ... officer might have hoped to find evidence relating to cocaine trafficking is irrelevant to the Fourth Amendment analysis under *Whren,* because once probable cause exists, and a valid warrant has been issued, the officer's subjective intent in conducting the search is irrelevant.").

 The trial court also invalidated the first warrant based on a finding that the affidavit supporting it contained unreliable hearsay, specifically the information from Trooper Caplinger's colleague that Lauber's subordinate discovered an unauthorized electric meter on the Shirley property. A probable cause finding may be based on an affidavit containing hearsay if the information in the affidavit establishes that the totality of the circumstances corroborates the hearsay. *See Gates,* 462 U.S. at 230–31, 232, 103 S.Ct. 2317; *see also* Ind.Code § 35–33–5–2(b)(2) (stating substantially similar requirements under Indiana law). Although we agree with the trial court that multiple levels of hearsay such as the report from Trooper Caplinger's colleague may not support a probable cause finding standing alone, this was not the primary information Trooper Caplinger relied upon in preparing his affidavit. *Cf. Mitchell,* 745 N.E.2d at 784 (declining to address whether an employee's uncorroborated hearsay statements rendered a probable cause affidavit deficient because "[t]he information provided by the ... employee was only presented as a prelimi-nary introductory matter to explain the investigation but did not provide information crucial to the probable cause determination"). Indeed, after receiving information from his colleague, Trooper Caplinger spoke with Huffman, who informed Trooper Caplinger that he visited the Shirley property and observed an extension cord running from the 7030 electric meter to the barn.

Huffman was therefore an informant whose reliability turns in part on whether he falls under the "professional" class of informants—those who provide information in exchange for a reward (such as money or leniency) and as such demand scrutiny, *see Pawloski v. State,* 269 Ind. 350, 354, 380 N.E.2d 1230, 1232 (1978)—or the "concerned citizen" class of informants, *see Kellems v. State,* 842 N.E.2d 352, 356 (Ind.2006), *reh'g granted on other grounds,* 849 N.E.2d 1110. Our supreme court has described the latter class as including

> the victims of crime or persons who personally witness a crime. These individuals generally come forward with information out of the spirit of good citizenship and the desire to assist law enforcement officials in solving crime. They are usually one-time informants and no basis exists from prior dealings to determine their reliability. Further, information of this type usually goes to past completed crimes rather than future or continuing crimes.

*Kellems,* 842 N.E.2d at 356 (quoting *Pawloski,* 269 Ind. at 354, 380 N.E.2d at 1232). Although we hesitate to conclude that informants such as Huffman who provide law enforcement with information obtained during the course of their employment always fall under the "concerned citizen" class of informants, *but cf. United States v. Nilsen,* 482 F.Supp. 1335, 1340 (D.N.J. 1980) ("Where the declarant of the hearsay contained in the search warrant affidavit is

a victim or other innocent and disinterested witness, such as an employee, there is 'built-in' a substantial basis for crediting the reliability of the declarant and the credibility of his conclusion."), we nevertheless observe that Huffman's status as an informant is more accurately described as that of a concerned citizen because he personally witnessed evidence of an ongoing crime (i.e., electricity theft) and did so not because he expected a reward similar to what a "professional" informant might expect, but because he was obligated to do so as an employee of Rural Electric. We also observe that Huffman's status as a concerned citizen informant is not dispositive in determining whether his hearsay was reliable; instead, the totality of the circumstances controls. *See Gates*, 462 U.S. at 230–31, 103 S.Ct. 2317; *Kellems*, 842 N.E.2d at 356. In that regard, we note that Trooper Caplinger was able to gauge the reliability of Huffman's report because he had driven by the Shirley property the day before he spoke to Huffman. We therefore conclude that the totality of the circumstances, including Huffman's status as a "concerned citizen" informant, sufficiently corroborates Huffman's hearsay so as to render it reliable.

Having rejected the trial court's findings as contrary to Fourth Amendment case law and concluded that Huffman's hearsay testimony was reliable, we are left with the task of resolving the single issue presented in this case, namely, whether the circumstances set forth in Trooper Caplinger's affidavits gave the magistrate a substantial basis to find there was probable cause to search the barn, white camper trailer, and tan camper. We reiterate that probable cause analysis requires the magistrate to "simply ... make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a

particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317; *see also Esquerdo v. State*, 640 N.E.2d 1023, 1029 (Ind.1994) ("Probable cause to search premises is established when a sufficient basis of fact exists to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime.").

 The presence of an extension cord running from an unauthorized electric meter into the barn convinces us there was a substantial basis for the magistrate to conclude not only that there was a fair probability electricity was being stolen, but also a fair probability that evidence relating to the electricity theft would be found in the barn. That evidence of electricity theft would be found in the white camper trailer is more tenuous because Trooper Caplinger's first affidavit merely states that the camper trailer was next to the barn and that he observed a light on inside. Still, construing this evidence with significant deference to the magistrate's determination and focusing on the reasonable inferences drawn from it, as we must, *see Spillers*, 847 N.E.2d at 953, we conclude there was a substantial basis for the magistrate to find, based on the proximity of the camper trailer to the barn and Trooper Caplinger's observation that a light was on, that a search of the camper trailer also would yield evidence of electricity theft. The magistrate did not, however, have a substantial basis to conclude that evidence (methamphetamine-related or otherwise) would be recovered from the tan camper because Trooper Caplinger's second affidavit merely states that he observed the camper next to the barn. Absent further detail or argument that there was a "nexus" between the barn and the camper, *see Figert*, 686 N.E.2d at 832 (discussing the "nexus" requirement in the context of the good-faith exception to the exclusionary rule), we cannot conclude the

magistrate had a substantial basis to find there was a fair probability that a search of the tan camper would uncover evidence.

### Conclusion

The trial court properly concluded the State lacked probable cause to search the tan camper, but improperly concluded the Stated lacked probable cause to search the barn and the white camper trailer.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and MAY, J., concur.